19408

FINANCE, INC., Respondent, v. M. L. HALTIWANGER and G. E. Haltiwanger, Appellants

(188 S. E. (2d) 472)

*Eugene C. Griffith, Esq.,* of *Blease, Griffith, Stone & Hightower,* Newberry, *for Appellants,*

*Joseph M. Epting, Esq.,* of *Berry, Lightsey, Gibbes* and *Bowers,* Columbia, *for Respondent,*

May 2, 1972.

LITTLEJOHN, Justice:

The plaintiff, Finance, Inc., commenced this action to recover a deficiency judgment in the amount of $7,202 alleged to be due because the chattel mortgage foreclosure sale of a timberjack logging machine did not bring the amount of the total debt due according to the terms of the note.

The defendants, M. L. Haltiwanger (maker of the note), and G. E. Haltiwanger (endorser), answered the complaint, denying liability, and alleged by way of counterclaim that the plaintiff removed the winch and other parts from the machine and replaced them with defective parts, thereby decreasing the value of the machine prior to the foreclosure sale and causing it to bring less at the auction. Defendants alleged that the machine was worth $3,528 more than the debt the mortgage secured, and asked a judgment against the plaintiff in the amount of $3,528 actual damages, plus

$10,000 punitive damages because of alleged breach of contract, accompanied by a fraudulent act.

The plaintiff replied to the counterclaim, interposing a general denial.

At the end of all the testimony plaintiff moved for a directed verdict, which was denied. The jury found in favor of the defendants, $3528 actual damages plus $10,000 punitive damages on the counterclaim.

Thereafter plaintiff moved for judgment in the amount of $7,202 *non obstante veredicto,* which was granted by the trial judge. From such order defendants appeal, asking this Court to reinstate the verdict of the jury as the judgment of the lower court.

The facts out of which this litigation arose are as follows: On June 3, 1966, M. L. Haltiwanger purchased the timber-jack machine in question from Woods Machinery, Inc. of Columbia. The conditional sales contract (mortgage) and an installment note were executed by him at the time of the sale. The contract called for a cash payment of $10,261, with a balance of $18,940 to be paid in 36 monthly installments. Woods Machinery, Inc. subsequently assigned the note and finance contract to Finance, Inc., the plaintiff. By winter and spring of 1968 the defendant had defaulted in the payments which eventually brought about the public foreclosure sale on July 1, 1968. There was no judicial proceeding incident to the sale.

The defendants, in their answer, admitted that according to the terms of the contract $9,472 remained unpaid. The gist of the counterclaim of the defendants is the allegation that between June 14, 1968 when the plaintiff took possession of the equipment, and July 1, 1968, when the sale was conducted, the plaintiff or its agents removed the winch from the machine and replaced it with a defective winch, thereby lessening its value and depressing the bidding at the sale. Plaintiff sold the equipment after notice that the winch was

switched and over the objection of the defendants. It sold for $3,700; defendants contend it was worth $12,000 to $13,000.

The winch is an important and expensive component of a timberjack. The sole question for the determination of the trial judge below, and for this Court, is whether the evidence created a jury issue on the contention of the defendants that a good winch was removed and a defective winch substituted by plaintiff or its agents between June 14 and July 1.

For several weeks prior to June 14, 1968, the defendants tried unsuccessfully to sell the machine advantageously. The machine was placed by the defendants with the Pioneer Logging Company, a dealer in heavy equipment in Columbia. Arrangements were made to have the machine steam cleaned in hopes that Pioneer could find a buyer. Pioneer's attempts to sell the machine were in vain. Finally, the plaintiff and the defendants agreed that the plaintiff should repossess the timberjack and proceed under the contract to sell it.

On June 14, C & K Enterprises, at plaintiff's request, dispatched a truck to Pioneer and picked up the timberjack. C & K was also located in Columbia, and was engaged in the trucking, storing, repairing and selling of heavy equipment. The timberjack remained at C & K's yard until after the foreclosure sale on July 1.

The order of the trial judge disturbing the jury verdict and granting the *non obstante veredicto* motion of the plaintiff was bottomed on three basic findings:

1. That there was no evidence offered to indicate that C & K Enterprises was an agent of the plaintiff;

2. That there was no evidence offered to indicate a fraudulent act on the part of the plaintiff;

3. That there was no evidence as to the condition of the timberjack at the time C & K took possession of it on June 14.

These three rulings make the issues before us on this appeal.

The judge opined that the evidence produced "was not sufficient to take the case beyond the realm of speculation and conjecture."

In ruling upon the question we are required, as was the trial judge, to view the evidence in the light most favorable to the party against whom the motion was directed, or in the light most favorable to the defendants.

Assuming that a substitution of winches occurred, it was not necessary for the defendants to prove whether the substitution was brought about by C & K or by the plaintiff. It is not as though the winch disappeared, in which event one might only speculate as to who removed it. In the case of a substitution the inference arises that those in charge of the machinery (and responsible therefor) brought about the exchange.

From June 14 to July 1 the plaintiff held the timberjack in trust. It was the plaintiff's duty to safely keep the machine and to refrain from doing or permitting others to do any act which might depress its value or cause injury to the defendants.

"A person exercising his right to sell must have due regard to the interests of the mortgagor, or other persons, in the property. He is not entitled to act as the owner of the property, and, where he is the mortgagee, he is regarded as being an agent or trustee of the mortgagor, and his conduct and fairness in making the sale is always open to investigation by any person having a sufficient interest in the property." 14 C. J. S. Chattel Mortgages § 367.

During this time the timberjack was beyond the control of defendants and solely within the control of plaintiff. We do not agree with the trial judge when he held that the evidence is not susceptible of the inference that C & K were agents of the plaintiff. Counsel for plaintiff in their brief, admit ". . . it is clear that the plaintiff repossessed the trac-

tor and used the services of C & K to pick up the logging tractor from Pioneer Logging Company on June 14, 1968, and that the tractor was taken to the lot of C. & K Enterprises in Columbia and sold there by the plaintiff at public sale on July 1, 1968."

Plaintiff cannot excuse itself from its duty by placing the machine in the custody of another. C & K was acting as plaintiff's agent and its acts became the acts of the plaintiff. And if C & K or its agents and servants substituted the winch, plaintiff would be liable therefor the same as if it had done the act itself. When one is required to perform a duty, either under a contract or by reason of the law, and entrusts the performance of that duty to another he becomes responsible for the manner in which the duty is performed precisely the same as though he, himself, performed it, and this is so regardless of whether or not a particular act was authorized. See 53 Am. Jur. (2d) Master and Servant, § 423.

The evidence on the question of agency created at least a jury issue.

Other specific contentions of the defendants-appellants are (1) that the evidence warrants the inference that the machine was delivered to C & K as agent for the plaintiff on June 14 with a good winch attached and in working order, and (2) that the evidence warrants the inference that the machine was sold on July 1, with a substituted defective winch. The evidence must be reviewed to determine if the contentions are supported so as to make a jury issue. If the evidence supports these two inferences, a jury issue was created as to a breach of contract accompanied by a fraudulent act, and the verdict should not have been set aside.

We examine the evidence:

Witness Hartley, who was vice president of the plaintiff company, took the position that the winch on the machine June 14, was the original. Testifying, he stated: "I can state that it was a Hercules winch, that it was mounted in the

normal place, that it showed no tampering with and showed that it had been on the machine for some considerable period of time by the amount of mud and debris that had dried on the machine." There is other evidence to the same effect, but this evidence alone is sufficient to warrant the inference that the winch had not been substituted on that day (June 14). Though the evidence comes from the mouth of a witness for the plaintiff, the defendants are entitled to rely thereon. It was also the testimony of witness Hartley that the same winch was still on the machine on the date of the sale, but the jury did not have to believe all of Hartley's testimony. The jury had the right to believe him when he said the original winch was on the timberjack on June 14 and to disbelieve him when he said the same one was on the timberjack on July 1.

Witness T. P. Mills testified that he was familiar with this machine when the defendant Haltiwanger owned it. He attended the sale and said in response to question:

"Q. And what condition was it in on the day of the sale?

A. Well, immediately when I saw it, I could tell it had been tampered with. It had a different winch on it.

"Q. Was it the same winch that had been on the machine?

A. I couldn't answer that but I think it was changed because the bolts were all—had been tampered with and the fittings wouldn't fit, but as far as the winch, it being the same winch, I couldn't say."

Witness Glenn Metts testified that he had driven the machine out of the woods for the Haltiwangers to load it on a truck before it was carried to Pioneer. He said that the machine was operating perfectly at that time, including the winch. He further testified:

"Q. At the time you saw it at that sale, would you describe the condition of that machine?

"A. Well, it had a side shield off of it. The winch had been changed because the brake cylinder was not connected

and the hose that went to the brake cylinder would not hold, would not fit and the front grill of the front radiator was missing. Several of the control knobs were missing and the guard bar from the canopy in front of the hood was missing."

Defendant M. L. Haltiwanger testified that he attended the sale. He stated that the machine was worth about $12,-000 to $13,000. His further testimony was as follows:

"Q. All right. During the sale, was anything said about part of the hood being missing?

"A. There was.

"Q. What happened then?
"A. It was brought to the machine.

"Q. Somebody went and brought it to the machine?
"A. Yes, sir.

"Q. All right. Was anything said about the winch being changed?
"A. There was.

"Q. What was the reply to that?
"A. Well, they claimed they hadn't changed it."

There is testimony which, if believed, warrants the inference that the winch was not substituted, but the evidence we have pointed out is sufficient to warrant the inference that a substitution attributable to the plaintiff did in fact take place between June 14 and July 1. The Court is concerned with the existence or nonexistence of evidence not its weight. The evidence may be direct or circumstantial.

The plaintiff elected to discharge the duty imposed by law to protect the defendants by turning the equipment over to C & K Enterprises. The defendants had no choice in the matter. Vice-president Hartley of Finance, Inc., admitted that ". . . Mr. Haltiwanger and these other gentlemen arrived and they objected to the sale procedure." The plaintiff bought the equipment at the sale, and the evidence is susceptible of the inference that it brought less by reason of

the substitution of the winch. Plaintiff has now sought to procure a deficiency judgment inflated by the fact that the sale price was depressed. Whether the substitution was made by the plaintiff or by C & K is, under the facts, immaterial. Plaintiff should not be heard to say as a matter of law that it is not responsible for the acts of C & K. The issues were for determination by the jury.

Accordingly, we conclude that the lower court erred in vacating and uprooting the jury verdict. The case is remanded to the Court of Common Pleas for Newberry County for entry of judgment on the verdict.

Reversed.

Moss, C. J., and LEWIS, J., concur.

BRAILSFORD and BUSSEY, JJ., dissent.

BRAILSFORD, Justice (dissenting) :

I respectfully dissent from the opinion of Justice Littlejohn. He would reverse the judgment of the circuit court and reinstate the verdict upon the premises, (1) there was evidence that either the credit company or C & K Enterprises switched winches on Haltiwanger's timberjack, and (2) regardless of which is the culprit, the credit company is liable to Haltiwanger; hence, the issue of liability on the counterclaim was properly submitted to the jury. But if the credit company was not liable for the substitution if done by C & K without its knowledge, then the credit company must win, for there is no basis in the evidence for concluding that it, instead of C & K, did the substituting.

Justice Littlejohn's theory that the credit company owed an absolute duty to keep the timberjack secure from harm comes from the same source upon which he relied last year in his dissent in *Boykin v. Prioleau,* 255 S. C. 437, 179 S. E. (2d) 599 (1971), namely, 53 Am. Jur. (2d) Master and Servant, Sec. 423 (1970). On its face, the cited section is concerned with obligations which one "is bound absolutely to perform. . . ." It can have no application here where

the only duty owed by the credit company was the exercise of ordinary care in protecting the property from harm. 15 Am. Jur. (2d), Chattel Mortgages, Sec. 123 (1964); 14 C. J. S. Chattel Mortgages § 186 (1939). *Accord,* Sec. 10.9-207 of the UCC, enacted after this case arose: "A secured party must use reasonable care in the custody and preservation of collateral in his possession." The official comment states: "This Section applies when the secured party has possession of the collateral before default, as a pledgee, and also when he has taken possession of the collateral after default."

The credit company had the right to take possession of the chattel and dispose of it as provided by law. It had the right to store it with a third person pending a sale. This it did with C & K, a company in the City of Columbia, which was in the business of hauling, storing, repairing and selling machinery. According to the only testimony on the point, C & K was engaged by the credit company on June 14, 1968, to take possession of the timberjack, haul it to its place of business and there store it until the date set or to be set for a public sale. When this arrangement was made, the chattel mortgage was in default, and the credit company had title to the property and right to possession. This was a classical bailment (with the credit company as bailor and C & K as bailee), to which respondeat superior principles do not apply. 8 Am. Jur. (2d), Bailments, Sec. 259 (1963). No effort was made to prove a different relationship. In this situation, proof that C & K fraudulently switched winches would not establish liability against the credit company. I agree with the circuit judge that the verdict was not supported by sufficient evidence and was based upon speculation and conjecture. I would affirm the judgment appealed from.

BUSSEY, J., concurs.